**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**SIMON ANDREW ODONI,**

     **Petitioner,**

**v.**                               **Case No: 8:16-cv-1231-T35AAS**
                                      **Case No. 8:08-cr-172-T35EAJ**

**UNITED STATES OF AMERICA,**

     **Respondent.**

_____

## ORDER

This matter is before the Court on Petitioner Simon Andrew Odoni's Amended Motion under 28 U.S.C. Section 2255 to Vacate, Set Aside, or Correct Sentence.   Civ. Docs. 33 and 34. The United States filed a Response in Opposition (Civ. Doc. 39), and Odoni filed an Amended Reply (Civ. Doc. 80).   For the reasons stated herein, Odoni is not entitled to relief.

**I.**     **STATEMENT OF THE CASE AND FACTS**

     **A.**     **Procedural History**

A federal grand jury in Tampa, Florida, returned a 36-count superseding indictment charging Paul Gunter, Odoni, and others with various offenses relating to two investment-fraud schemes. Crim. Doc. 160.   Count One charged Gunter, Odoni, and others with conspiring to commit mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.   *Id.* at 14–28.   Count Two charged Gunter, Odoni, and others with conspiring to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.   *Id.* at 28–34.   Count Three charged Gunter, Odoni, and others with conspiring to commit various money laundering offenses, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1957,

and 1956(h).   *Id.* at 34–39.   Counts Four through Seven and Nine through Seventeen charged Gunter and others – including Odoni, in Count Eleven – with engaging in illegal monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2.   *Id.* at 39–44. Counts Eighteen through Twenty-Seven charged Gunter, Odoni, and others with mail fraud, in violation of 18 U.S.C. §§ 1341 and 2.   *Id.* at 44–47.   Counts Twenty-Eight through Thirty-Six charged Gunter, Odoni, and others with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.   *Id.* at 47–51.   Following a lengthy joint trial, Odoni and Gunter were convicted as charged.   Crim. Doc. 849 at 7–12.   Odoni was sentenced to 160 months' imprisonment. *Id.* at 863.

Odoni appealed, claiming that (1) this Court lacked personal jurisdiction over him; (2) there was insufficient evidence to convict him; (3) this Court erred in denying his motion for a new trial; and (4) his 160-month sentence was unreasonable. In January 2015, the Eleventh Circuit Court of Appeals rejected Odoni's claims and affirmed his convictions and sentence.   *United States v. Odoni*, 782 F.3d 1226 (11th Cir. 2015). Odoni's petition for Supreme Court review was denied on May 18, 2015. *Odoni v. United States*, 135 S. Ct. 2339 (2015).

Odoni timely filed his initial Section 2255 motion, and this Court ordered the United States to respond.   Civ. Docs. 1 and 4; *Washington v. United States*, 243 F.3d 1299, 1300 (11th Cir. 2001) (explaining that if a prisoner timely petitions for certiorari review, the Section 2255 limitation period "begins to run when the Supreme Court denies certiorari or issues a decision on the merits").   Before a response was filed, however, Odoni moved to amend his Section 2255 motion.   *See generally* Civ. Docs. 9–27.   In late September 2017, this Court granted Odoni's motion to file an amended Section 2255

motion.  *Id.* at 30—34.   The United States filed its Response in Opposition to the amended Section 2255 motion, and subsequently, Odoni filed his Amended Reply.  *Id.* at 39 and 80.

### B.    Factual Background

The following summary of Odoni's two criminal schemes is quoted from the Eleventh Circuit's decision affirming his convictions and sentence:

> *A. Fraudulent-Stock Scheme*
>
> Lawrence Hartman and Richard Pope began operating a fraudulent-stock scheme in 2003.  Hartman would procure valueless United States shell companies that did no real business but appeared to be legitimate publicly-traded entities.  Pope would then recruit salespeople to sell stock in those companies to investors.  Hartman and others created brochures, websites, and press releases containing fabricated information meant to portray the shell companies as legitimate investment opportunities.   Pope's salespeople, called "advisors," would call potential investors, mostly in the United Kingdom, and try to sell them stocks in the shell companies using "scripts" based on fabricated information intended to make the companies looks more attractive.
>
> Odoni played two key roles in the fraudulent-stock scheme. First, he managed Bishop and Parkes, an advisor group that employed a sales floor of advisors, *i.e.*, individuals who used fabricated scripts to sell stocks in the valueless shell companies.  Odoni's responsibilities at Bishop and Parkes included managing the sales floor, helping advisors' "write good scripts," and ensuring advisors were "chasing money in." In exchange for his work, Odoni received a portion of the investors' funds.
>
> Second, Odoni served as the CEO and sole director of Nanoforce Incorporated, one of the valueless shell companies Hartman procured.   Salespeople told investors that Nanoforce was a technology business, although, in reality, Nanoforce did no business.   In early May 2005, Odoni helped create a website for Nanoforce and told Hartman "[i]t would probably look better" to use a webhosting company located in the United States.   In June 2005, Odoni circulated a

Nanoforce press release to Paul Gunter, Richard Pope, and Zibiah Gunter, among others.  The press release contained false statements about Nanoforce's business and efforts to expand.   Beginning in mid-2005, Odoni signed board resolutions approving the issuance of Nanoforce stock to investors who had purchased shares.  From May 25, 2005, through December 20, 2005, advisor groups convinced investors to buy more than $12 million of worthless Nanoforce stock.

## B.   Forex Fraud Scheme

In addition to the fraudulent-stock scheme, Odoni also participated in a Forex fraud scheme, which involved the sale of foreign-exchange options.   Foreign-exchange options allow investors to speculate on the future prices of major currencies such as the pound, yen, euro, and dollar.

In furtherance of the Forex scheme, Michael Geraud, Jeff Jedlicki, and others created Hartford Management Group, a Barcelona firm that employed salespeople who called potential investors and persuaded them to buy foreign-exchange options.   Legitimate firms selling foreign-exchange options are required to disclose the risks of foreign currency investment and honestly advise investors about the outlook of the foreign currency market.   Hartford Management Group, by contrast, falsified information about future developments in the currency market and told investors only about the profits they could expect to gain from trading in the foreign exchange market without disclosing any of the associated risks. Legitimate foreign currency firms also typically place trade hedges against their clients' trades, so that if a client is right about the price movement of a currency, the firm has enough money to pay the client back.   Hartford Management Group, on the other hand, "never hedges [its] accounts at all"; they "just rolled the dice that over time the clients would lose."

Odoni participated in the Forex fraud scheme by providing escrow services to Hardford Management Group—that is, he received investor funds and transferred them to a clearing firm.   In this role, Odoni created an escrow company, International Escrow Enterprises, and set up accounts at Bank of America to receive investor funds.   In exchange for providing these escrow services, Odoni collected a 5% escrow fee, which he split with co-defendant Paul Gunter and Richard Pope.   In total, more than $10.7 million of investor

> funds came through International Escrow Enterprise's bank accounts.

*Odoni*, 782 F.3d at 1229–31 (footnote omitted).

## II.   LEGAL STANDARDS

### A.   Burden of Proof

In general, on collateral review the petitioner bears the burden of proof and persuasion on each and every aspect of his claim, *In re Moore*, 830 F.3d 1268, 1272 (11th Cir. 2016) (collecting cases), which is "a significantly higher hurdle than would exist on direct appeal" under plain error review, *United States v. Frady*, 456 U.S. 152, 164–66 (1982).   Accordingly, if this Court "cannot tell one way or the other" whether the claim is valid, then the petitioner has failed to carry his burden.   *Moore*, 830 F.3d at 1273; *cf. United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005) (in plain error review, "the burden truly is on the defendant to show that the error actually did make a difference … Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test, and the burden is on the defendant.").   Odoni cannot meet this burden.

### B.   Cognizability

Odoni's claims that counsel was ineffective are grounded in the Sixth Amendment and are cognizable under 28 U.S.C. Section 2255.   *Lynn v. United States*, 365 F.3d 1225, 1234 n.17 (11th Cir. 2004) (ineffective assistance claims should be decided in Section 2255 proceedings).

### C.   Merits

In his amended Section 2255 motion, Odoni raises five claims of ineffective assistance based on counsel's alleged failure (1) to retain expert investigative services;

(2) to retain a forensic accountant; (3) to produce email evidence; (4) to advise Odoni of the risks of a joint defense agreement; and (5) to conduct reasonable pre-trial investigations.   Civ. Docs. 33, 34, and 80.

### 1.     Ineffective Assistance of Counsel Generally

To succeed on an ineffective assistance of counsel claim, a petitioner must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When evaluating performance, this Court must apply a "strong presumption" that counsel has "rendered adequate assistance and [has] made all significant decisions in the exercise of reasonable professional judgment."   *Id.* at 690.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*; quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir.1992)).

To establish deficient performance, a petitioner must show that "no competent counsel would have taken the action that his counsel did take."   *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*).   A petitioner demonstrates prejudice only when he establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*   If the petitioner fails to establish either of

the *Strickland* prongs, his claim fails.   *Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005).

### 2.   Failure to Call Witnesses and Retain Experts

Generally, counsel's failure to call particular witnesses the petitioner thinks would be helpful does not constitute ineffective assistance of counsel.   *Hardwick v. Crosby*, 320 F.3d 1127, 1161 (11th Cir. 2003).   Instead, it is regarded as a strategic or tactical decision.   *Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999) (counsel's failure to call a witness who claimed she saw the victim alive after the State alleged the defendant killed her was not ineffective when counsel believed the witness would not make a good witness).   "Which witnesses to call, and when to call them, is the epitome of a strategic decision."   *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004).

To demonstrate ineffective assistance of counsel for failing to call expert witnesses, a petitioner must show this failure caused his performance to fall outside the bounds of reasonable professional judgment.   *Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001) (holding that the petitioner did not establish ineffective assistance based on defense counsel's failure to call an expert witness because the petitioner failed to show that counsel's decision was so patently unreasonable that no competent attorney would have chosen that strategy); *see also Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'").

### 3.   Failure to Conduct Pre-trial Investigation

"The Sixth Amendment guarantees a defendant the right to reasonably effective assistance of counsel." *Mitchell v. Kemp*, 762 F.2d 886, 888 (11th Cir. 1985). Defense counsel's duty to investigate before trial is governed by a reasonableness standard.   *Id.* at 888–89; *Strickland*, 466 U.S. at 691.   Defense counsel must perform a "reasonable" investigation or make a "reasonable" decision that such an investigation is not warranted.   *Mitchell*, 762 F.2d at 888; *Strickland*, 466 U.S. at 691.   Further, defense counsel's decisions regarding the level of investigation warranted must be viewed with a strong presumption of reasonableness at the time the decision regarding investigation was made, not with the benefit of hindsight.   *Id.* at 689.   No absolute duty exists to investigate particular facts or a certain line of defense. *Chandler*, 218 F.3d at 1317.   To show counsel's performance was unreasonable, a petitioner has the burden of proving that "no competent counsel would have taken the action that his counsel did take."   *Id.* at 1315.   The decision whether to present a line of defense or even to investigate it, is a matter of strategy and is not ineffective unless the petitioner can prove that the chosen course, in itself, was unreasonable.   *Hardwick*, 320 F.3d at 1162, n. 146.

A tactical decision amounts to ineffective assistance of counsel "only if it was so patently unreasonable that no competent attorney would have chosen it."   *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983); *accord Strickland*, 466 U.S. at 690. Tactical decisions made by counsel do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course.   *Adams v. Balkcom*, 688 F.2d 734, 739 (11th Cir. 1982); *see also Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988).   Thus, a court deciding an ineffectiveness claim must judge the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.   *Strickland*, 466 U.S. at 690.

### 4.     Vague, Conclusory, and Unsupported Claims

It is well established that *pro se* complainants are held to less stringent pleading standards than those applicable to lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). The Court, however, cannot make assumptions as to the intent of claims raised by a Section 2255 petitioner. *See Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008) ("Although we liberally construe *pro se* filings, we do not assume the role of advocate." (internal quotation marks omitted)).   Accordingly, claims not fairly raised will not be entertained on collateral attack. *United States v. Jones*, 614 F.2d 80 (5th Cir. 1980); *Walker v. Dugger*, 860 F.2d 1010, 1011 (11th Cir. 1988) (claims raised only superficially will not be treated as properly raised). Claims that lack specificity will also be dismissed without further consideration.   *Jones*, 614 F.2d at 81–82 (district court was justified in dismissing petitioner's Section 2255 claims when petitioner presented only conclusory allegations to support those claims).

Likewise, vague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Caderno v. United States*, 256 F.3d 1213, 1217 (11th Cir. 2001) (vague, conclusory allegations in a Section 2255 motion are insufficient to state basis for relief); *see also Saunders v. United States*, 278 F. App'x 976, 979 (11th Cir. 2008) (petitioner must allege "reasonably specific, non-conclusory facts with respect to his claim such that there was a reasonable probability sufficient to undermine confidence in the outcome.").

### III.  SUBSTANTIVE ANALYSIS

### A.  Grounds One, Two, and Five

Odoni claims that counsel was ineffective because he failed to secure various experts and did not conduct "reasonable pre-trial investigations[.]"  Civ. Doc. 33 at 4–5, 9.  These claims are unsupported and contradicted by the record and the affidavit of Bjorn E. Brunvand, Odoni's former trial counsel.

#### 1.  Ground One

In Ground One, Odoni claims his counsel should have retained "expert investigative services" so he could better address: the "activities of the Rendina family and their associates" regarding several companies including Nanoforce and Transglobal; the methods by which 9.5 million shares of Nanoforce were allegedly transferred to Odoni and illegally redistributed without his knowledge or consent; that Odoni was an "unwitting puppet" in a scheme planned by his codefendants; and that Odoni had no "reason to suspect there was anything criminal going on when he worked for Nanoforce, Inc."  Civ. Doc. 34 at 7–9.  Odoni provides documents to support his assertions regarding his involvement with Nanoforce and claims that, with proper investigation, these documents, used in conjunction with unidentified witnesses, would have caused the jury to find him not guilty.  *Id.* at 9 and Civ. Doc. 34-1.

Odoni's contention that further investigation of the Rendina family's role in Nanoforce would have changed the outcome of the trial fails.  The January 25, 2007, letter purportedly signed by "David Rendina, CEO" upon which Odoni relies, Civ. Doc. 34-1 at 4, was sent to Nanoforce investors advising them that they were being issued a Refinery Science Corp. stock certificate as a distribution (dividend) of Nanoforce's assets.

This document was introduced and discussed at trial several times. Victim investors testified that they received this letter and the Refinery Science shares as a dividend but had no dealings or communication with "David Rendina."   Crim. Doc. 836 at 28–29; Crim. Doc. 838 at 194–197; Crim. Doc. 845 at 39–40.   Odoni fails to provide any evidence, such as affidavits or other verified documents, to support his claim of involvement by the "Rendina family."   Counsel cannot be deemed ineffective for failing to investigate this unsupported claim.

Moreover, according to counsel, he and Odoni discussed the "various defenses available" and decided to pursue a defense "consistent with the position [Odoni] had maintained since [counsel] first met him, that he was an innocent victim" of Pope, Gunter, and others.   Civ. Doc. 39, Ex. A at ¶ 8.   Because they were conceding the fraud occurred and arguing Odoni was a "victim" and "unwitting puppet" of Pope and the others, they determined that "investigators with specialized training in security laws or forensic accountants would really not add anything" to the defense. *Id.*

Odoni also fails to support his claim that a full pre-trial investigation by counsel would have revealed that he was unaware of the transfer of 9.5 million Nanoforce shares into his name.   Civ. Doc. 34 at 8.   Odoni contends that such an investigation would have bolstered his "puppet" defense. *Id.* Contrary to Odoni's claim, as discussed more thoroughly below, however, counsel did elicit testimony that Odoni was a "puppet" for Pope and the others. Crim. Doc. 838 at 50–52. This comports with Odoni's agreed-upon defense theory. Notwithstanding this testimony, the Eleventh Circuit upheld the judgment and sentence against Odoni based on the fact that "Odoni knew the stocks he sold were worthless because he was the CEO of Nanoforce, a fictitious shell company similar to the

ones being pitched on his sales floor.   As the CEO of Nanoforce, Odoni knew the company did not conduct any legitimate business."   *Odoni*, 782 F.3d at 1232.

Finally, Odoni claims that documents detailing Nanoforce's operations, including "mergers with other entities, sales of shares, multiple press releases, hiring of other executive, scientists and agents, the US Government financial grant to fund research and the award of patents for new technologies[,]" were never presented to the jury, despite the fact that he provided them to counsel before trial.   Civ. Doc. 34 at 8–9.   Odoni fails to show how these documents support his assertion that a "full investigation" of the corporations and individuals involved would have resulted in a "proper defense" and a different trial outcome.

The Eleventh Circuit reviewed Odoni's challenge to the sufficiency of the evidence, concluding that "[t]he evidence that Odoni knowingly and intentionally engaged in the schemes to defraud was more than sufficient; it was overwhelming."   *Odoni*, 782 F.3d at 1232.   This included "ample circumstantial evidence of Odoni's knowledge."   *Id.*   The overwhelming evidence introduced at trial regarding Odoni's knowledge and intent concerning Nanoforce included January 2008 emails.

Specifically, Odoni emailed Gunter and Pope to alert them to certain information he had seen on the Internet.   Crim. Doc. 837 at 104-05.   In an email, Odoni stated, "I found some very disturbing stuff on one of the links on Motley Fool which leads me to believe an insider is leaking info on our activities. Who the fuck could this be??????" Crim. Doc. 837 at 105.   Odoni explained that an anonymous Internet poster had made connections between International Escrow Enterprises, Nanoforce, and other entities, accounts, locations, and people involved in the fraud schemes.   *Id.* at 105-06.   Odoni

wrote, "No one here knows ANYTHING about IEE," and asked Gunter and Pope, "[W]ho the hell knows all this???" *Id.* at 105.   Odoni noted that the Internet poster had described Odoni as "nothing but a front man for others," and he closed the email by telling Gunter and Pope: "You need very much to be on your guard and lets [sic] get together bloody quickly and figure this shit out." *Id.*

Gunter agreed that the Internet posting was "quite disturbing." *Id.* at 106.   In response, Odoni told Gunter and Pope that he had done further digging and had discovered more posts that he characterized as "very disturbing." *Id.* at 106-07.   Among other things, these posts claimed that Odoni was "a gopher for the big guys who are too smart to have their names on anything." *Id.* at 107.   In response, Pope suggested that they speak by phone the following day, rather than continuing discussions by email. *Id.* at 107-08.

To prevail on his claim that counsel was ineffective because he did not retain expert investigative services, Odoni must show that counsel's performance was outside the bounds of reasonable professional judgment and that no competent counsel would have taken the action his counsel did take.   Odoni clearly fails to satisfy this burden. Odoni offers no specificity as to what this investigation would have revealed.   He certainly does not suggest that this investigation would have negated his own email traffic from which any reasonable juror could have inferred at least a guilty conscience and, at most, an unwitting confession of guilt.   In sum, Odoni has offered no specific explanation as to the prejudice he claims to have suffered.   Odoni's conclusory statement that his Sixth Amendment right to a fair trial was violated does not meet the *Strickland* standard. Odoni is not entitled to relief on Ground One.

###### 2.    Ground Two

In Ground Two, Odoni speculates that, had counsel retained a forensic accountant, he would have been able to impeach several government witnesses during cross examination, which "may have led to charges of obstruction of justice in some cases." Civ. Doc. 34 at 11.   In addition, he asserts that a forensic accountant would have enabled counsel to discredit an international wire transfer incorrectly attributed to Odoni.   *Id.* at 11–12.   Odoni surmises that a forensic accountant would have allowed counsel to present unspecified "true facts" to the jury resulting in a different outcome.[1]   *Id.* at 12.   As noted above, according to defense counsel, he and Odoni determined that a forensic accountant would not have benefitted the defense. Civ. Doc. 39, Ex. A at ¶ 9.

The record shows that Odoni's counsel conducted lengthy cross-examination regarding the document that reflected the international wire transfer to Odoni, which was identified at trial as Government Exhibit 1131B, repeatedly pointing out that attributing those funds to Odoni was a possible mistake.   Crim. Doc. 847 at 100–106. This line of defense continued through closing arguments when counsel argued that this transfer of funds, which was erroneously portrayed as benefiting Odoni, was a "snapshot[] of [his] innocence."   Crim. Doc. 848 at 95–97 ("[T]he intent" of the witness testimony about the transfer "was to mislead you to believe that that money went to Simon Odoni. And it's clearly not the case."); *see also* Civ. Doc. 39, Ex. A at ¶ 9 ("The evidence of the $300,000 transaction evidence [sic] ended up being used as a persuasive snapshot of innocence

---

1 To the extent that Odoni argues that a forensic accountant would have testified about "petitioner's involvement and participation in the alleged conspiracy[,]" Civ. Doc. 34 at 11, such argument lacks merit because the testimony would not have been admissible.   An expert witness may not testify as to his opinion concerning ultimate legal conclusions. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of the law.").

in the trial, since it was made clear to the jury that the government made a mistake in their evaluation of those funds and their attempt to connect those funds to Mr. Odoni or an entity connected to him.").

Counsel also raised this issue in a motion for new trial and request for evidentiary hearing, claiming that when the jury asked for a copy of "Government Exhibit 1133B", it was intending to request Government Exhibit 1131B—the document reflecting the international wire transfer to Odoni.   Crim. Docs. 794 and 807. Counsel further claimed that when the jury was told that there was no "Government Exhibit 1133B", the jury erroneously believed that Government Exhibit 1131B, which was one of Odoni's essential "snapshots of innocence," also did not exist.   Crim. Doc. 794 at 4.   This Court denied Odoni's motion for a new trial (Crim. Doc. 816), and the Eleventh Circuit affirmed that decision. Odoni, 782 F.3d at 1233 ("There is no basis in the record for Odoni's claim that the jury's question meant the jurors did not consider all of the exhibits.").

Odoni's contention that he would not have been convicted had counsel corrected erroneous testimony by a government witness about an international wire transfer of €300,000 to an account controlled by Odoni and challenged the testimony of Zibiah Gunter regarding funds sent to Odoni, lacks merit.   Civ. Doc. 34 at 12.   Odoni fails to overcome the presumption that counsel's decision to forego hiring an expert witness was anything other than trial strategy. He also offers no evidence he suffered any prejudice as a result of counsel's decision.   *Strickland*, 466 U.S. at 689; *United States v. Perry*, 908 F.2d 56, 59–60 (6th Cir. 1990). Odoni also fails to support his claim that retention of a forensic accountant expert would have resulted in a different outcome at trial.   These claims entitle him to no relief.

### 3.    Ground Five

In Ground Five, Odoni asserts that had counsel conducted a "reasonable" pre-trial investigation, his cross-examination of witnesses and challenges to the evidence would have been more effective and counsel would have been able to better identify possible defense witnesses.   Civ. Doc. 33 at 9; Civ. Doc. 34 at 17–24.   However, Odoni fails to demonstrate deficient performance or resulting prejudice, and therefore, he is not entitled to relief on this ground.

Odoni's assertion that counsel was ineffective because he failed to inspect and photograph his "office" located at 8270 Woodland Center Boulevard, in order to contradict testimony that the location was a "virtual office," fails. Civ. Doc. 34 at 17–18. Evidence admitted during trial clearly showed this location was a "virtual office."  Odoni himself described it as such in email. Crim. Doc. 845 at 146, 157 ("[M]y CC has been whacked for the virtual office in the tune of $571.00." and "Temple- $ 392.00 for the virtual office facilities").

Additionally, the evidence Odoni suggests should have been raised during Pope's cross-examination was discussed at length during trial.   During his opening statement, counsel asserted that Odoni knew Pope socially and had "only sporadic contact" with him between 1985 and 2005.   Crim. Doc. 833 at 50.   Counsel emphasized that "Mr. Odoni was used as a pawn or puppet by Mr. Pope and others[.]").   *Id.* at 52.   Counsel further urged that Odoni had "absolutely no knowledge whatsoever of any fraud" being committed.   *Id.* at 53.   These same points were elicited on cross-examination of Pope. Crim. Doc. 838 at 42–44 (Pope and Odoni connected in 1985 and had sporadic contact until the late 1990's.); *id.* at 50–52 (Pope described Odoni as a puppet during prior

testimony.); *id.* at 71–72 (Odoni was not included in various emails.); *id.* at 74–76 (Odoni established an escrow account of the Forex industry started by Gunter and took care of Coco Cabana for Pope.). This line of questioning comports with Odoni's defense theory.

The record also contradicts Odoni's claim that counsel was ineffective during cross-examination of David Manley. On cross-examination, counsel elicited from Manley that Odoni voluntarily turned himself into the police, that Odoni was concerned that investors get their money back, and that Odoni's interview with Manley may have been confusing because the parties to the interview were talking over one another.   Crim. Doc. 843 at 107–110.

Odoni fails to demonstrate that defense counsel's investigation was deficient. Further, the issues Odoni claims counsel should have investigated, in fact, were raised during trial.   Odoni's allegations of ineffective assistance of counsel constitute neither deficient performance nor prejudice and entitle him to no relief.

### B.    Ground Three

In Ground Three, Odoni alleges that counsel's failure to produce email evidence at trial exposing witnesses' "character and motives" prejudiced his defense.   Civ. Doc. 33 at 6–7.   To support his claim, Odoni provides a selection of emails he claims would have discredited witnesses' testimony and would have supported Pope's testimony that Odoni was "merely a 'puppet.'"   Civ. Doc. 34 at 13–14.   Contrary to Odoni's claim, counsel used several emails "brought to [his] attention by Simon Odoni in an attempt to persuade the jury that [Odoni] was a victim rather than a willing participant in the fraudulent conspiracy."   Civ. Doc. 39, Ex. A at ¶ 10.

Odoni claims that an email between Pope and his Dominican Republic neighbor,

Patrick Smit, shows Pope's deceptive character and motive. Civ. Doc. 34 at 13–14; Civ. Doc. 34-3. Odoni believes this email, and the others he attached to his motion, demonstrate that these witnesses were deceptive and untruthful. Counsel, however, consistently pursued the agreed–upon defense that Odoni was an unknowing and unwitting participant. During cross-examination, counsel even elicited an admission from Pope that he was "a master of deception." Crim. Doc. 838 at 68. Contrary to Odoni's claim, counsel conducted a lengthy cross-examination of witness Sean McCart, questioning him about his role as president of Knightsbridge and Crown Escrow Service and meetings with Odoni in Spain. Crim. Doc. 841 at 16–22. Moreover, counsel traveled to the Dominican Republic and United Kingdom to interview witnesses and, with the assistance of an investigator, interviewed or attempted to interview other witnesses by telephone or electronically. Civ. Doc. 39, Ex. A at ¶¶ 4–6.

To the extent counsel did not use all the emails suggested by Odoni, counsel made tactical decisions not to rely on those emails, decisions which Odoni has not shown to fall outside the bounds of reasonable professional judgment. Accordingly, this claim entitles Odoni to no relief.

### C.    Ground Four

In Ground Four, Odoni contends that counsel failed to advise him of the risks associated with a joint defense agreement and did not consult with or support Odoni testifying at trial. Civ. Doc. 33 at 8; Civ. Doc. 34 at 15–16. This claim is contradicted by counsel's affidavit and the record.

Odoni's counsel states that there was no joint defense agreement, "formal, informal, or otherwise." Civ. Doc. 39, Ex. A at ¶ 11. Furthermore, even if there were a

joint defense agreement, Odoni fails to show that there was a conflict stemming from the use of any confidential information about him by a co-defendant that undermined the propriety of his conviction or his counsel's effectiveness.

Odoni also claims that he expected Gunter to "take the stand and confirm that Odoni had no knowledge of the criminality of the underlying charges and place Odoni in the position of least culpable and the recipient of little compensation" and that Odoni "had been lied to and manipulated, and had no knowledge."   Civ. Doc. 33 at 8.   Odoni offers no basis for this expectation, nor is any such expectation reasonable in light of the obvious significant risk to Gunter.

He further asserts that, had counsel properly prepared him to testify, the jury would have found him not guilty.   *Id.*   Odoni's claim that ineffective assistance of counsel caused him to be "unprepared and unable to affirmatively respond" when asked if he wished to testify, is equally unavailing.   "A criminal defendant has a fundamental right to testify in his defense." *United States v. Hun Thien Ly,* 646 F.3d 1307, 1313 (11th Cir. 2011) (citing *Rock v. Arkansas*, 483 U.S. 44, 52 (1987)).   "Although often framed as a right to testify, it is more properly framed as a right to choose whether to testify."   *Id.* (citing *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (*en banc*)).   That right "is truly protected only when the defendant makes his decision knowingly and intelligently."   *Id.* (citing *Teague*, 953 F.2d at 1533).   "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Topete v. United States*, 628 F. App'x 1028, 1029 (11th Cir. 2015) (citing *Teague*, 953 F.2d at 1532–33)).

During a break from trial, defense counsel for Gunter and Odoni advised the Court that it was "the defense's intention to rest after the Government rests without calling any witnesses[.]"   Crim. Doc. 847 at 72.   Gunter and Odoni were sworn and then engaged in an extensive colloquy with the Court concerning that decision.   *Id.* at 73.   During this exchange, Odoni confirmed his understanding that his lawyer was not going to present testimony or witnesses in defense of the charges "beyond the evidence and testimony that [the] lawyers have elicited so far by cross-examination of the Government's witnesses, … and the entry or admission of exhibits in the context of that cross-examination."   *Id.* at 73–74.   Odoni confirmed he understood that he was "entitled to testify on [his] own behalf[,]" and, alternatively, "not to testify so as not to incriminate [him]self."   *Id.* at 74.   Odoni denied being threatened or promised a specific outcome to give up his right to present a defense.   *Id.* at 75.   Odoni confirmed that he "had a full opportunity to discuss this decision with [his] lawyers before [he] made this decision not to present any further defense," and that he was satisfied with counsels' representation. *Id.* at 75. This Court then asked:

> THE COURT: Mr. Odoni, could you tell me, in your own words, what you understand your decision to be?
>
> DEFENDANT ODONI: Yes, I will not be mounting a defense in answer to the Government's case.

*Id.* at 76.   Odoni's counsel advised the Court that he "fully disclosed the risks and potential benefits" of this defensive strategy and that both counsel discussed it "extensively" with Odoni.   *Id.* at 76–77.   After the United States rested its case, both Gunter and Odoni immediately rested without offering any additional evidence and without testifying.   *Id.* at 115.

The record supports counsel's assertion that he "thoroughly discussed the pros and cons of Simon Odoni testifying throughout the trial preparations time as a well as during trial" and advised Odoni that it was exclusively Odoni's decision whether or not to testify.   Civ. Doc. 39, Ex. A at ¶ 11. Contrary to Odoni's unsupported claim, counsel spent "multiple hours and days" during trial preparation and while in trial preparing Odoni to testify. *Id.* Ultimately, Odoni advised this Court he did not want to testify. Odoni's claims are contradicted by the record and counsel's affidavit and entitle him to no relief.

## III.    NEED FOR EVIDENTIARY HEARING

Odoni is not entitled to an evidentiary hearing.   No evidentiary hearing is required where, as here, the record establishes that a Section 2255 claim lacks merit.   *United States v. Lagrone*, 727 F.2d 1037, 1038 (11th Cir. 1984).   Odoni has not established the need for an evidentiary hearing because the issues he raises are facially insufficient to merit relief and are based on faulty legal reasoning. *But see Williams v. United States*, 660 F. App'x 847, 850 (11th Cir. 2016) (citing *Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979) (contested fact issues in section 2255 motions cannot be resolved solely on the basis of affidavits)).

## IV.    CONCLUSION

Odoni's pro se Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 33) is **DENIED**. Additionally, Odoni's "Request for Ruling on Petitioner's Section 2255 Motion to Vacate prior to His Release from Prison, August 4th, 2020" (Civ. Doc. 81) is **DENIED AS MOOT**. The CLERK is directed to enter a judgment against Odoni, enter a copy of this order in the criminal action, and **CLOSE THIS CASE**.

On September 8, 2020, Odoni filed a "Notice of Change of Address and Request

for Leave to File Supplementary Documentary Support to Final Reply to 2255 Motion to Vacate." (Civ. Doc. 82). He states that, due to the COVID-19 pandemic restrictions in his place of incarceration, he was unable to print and copy materials referenced in his amended reply. He has since been released from confinement and asks that the Court update the docket to reflect his current address. He further requests the Court grant him leave to file unspecified materials referenced in his amended reply.

Upon consideration, Odoni's motion is **GRANTED IN PART AND DENIED IN PART**. Odoni's motion is granted to the limited extent that the Clerk has already updated the civil and criminal dockets to reflect his current address. Odoni's motion is otherwise denied. Odoni filed his amended reply, including over 100 pages of supporting exhibits on April 6, 2020. (Civ. Doc. 80) Odoni waited over five months to seek leave of Court to file additional exhibits. During such time, he filed another motion, requesting that the Court rule on his Section 2255 motion before he was released from confinement. (Civ. Doc. 81) Therefore, the conditions of Odoni's confinement did not prevent him from timely seeking leave to file additional exhibits.

Odoni fails to explain why he delayed more than five months to file this motion. Furthermore, he fails to identify what specific materials he was unable to print and copy while confined. The Court has thoroughly considered Odoni's amended reply, including the supporting exhibits, and Odoni has not demonstrated a sufficient reason to grant him leave to belatedly file additional, unidentified materials.

**DONE** and **ORDERED** in Tampa, Florida, this 29th day of September, 2020.

_____

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person